<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr>
<td>

KALIEF WATSON,

        Plaintiff,

v.

MERCER COUNTY, *et al.*,

        Defendants.

</td>
<td>

Civil Action No. 23-23318 (GC) (JTQ)

**<u>OPINION</u>**

</td>
</tr>
</table>

**CASTNER, District Judge**

    **THIS MATTER** comes before the Court on the Motion to Dismiss (Motion to Dismiss) Plaintiff Kaleif Watson's First Amended Complaint (ECF No. 38 (Amended Complaint)) for failure to state a claim pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6) filed by Defendants Mercer County, Warden Charles Ellis, Deputy Administrator Asa Paris, Captain Michael Kownacki, Lt. J. Creighton, Correction Officer Anthony Herbert, Correction Officer M. Williams, Correction Officer Walker, Correction Officer J. Johnson, Correction Officer P. Santos, Correction Officer Riccitello, Correction Officer Lakeshi Durr, Correction Officer Brian Falcanio, Correction Officer Robert Brassell, Correction Officer Anthony L. Brown, Correction Officer Shawnie Davis, and Correction Officer Michael Mesday ("Moving Defendants").[1] (ECF No. 54

---

[1]    The Court refers to Ellis and Paris as the "the Policymaker Defendants;" Kownacki and Creighton as the "Field Supervisor Defendants;" Herbert, Williams, Walker, Johnson, Santos, Riccitello, Durr, Falconio, and Mesday as the "B Pod Correction Officer Defendants;" and Brassell, Brown, and Davis as "the Responding Correction Officer Defendants." The Court further refers to the Policymaker Defendants, the Field Supervisor Defendants, the B Pod Correction

(Motion to Dismiss).) Plaintiff responded (ECF No. 61), and the Moving Defendants filed a reply (ECF No. 62). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the Moving Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

A.    **The Amended Complaint[2]**

At all relevant times, Plaintiff was a pretrial detainee incarcerated at the Mercer County Correction Center ("MCCC"). (ECF No. 38 ¶ 1.)

In his Amended Complaint, Plaintiff alleges claims against: Mercer County, which is responsible for the policies, practices, supervision, implementation, and conduct of all matters pertaining to the MCCC and oversight of corrections officers and inmates, including the hiring, retention, discipline, supervision, and training of all law enforcement/corrections personnel; Ellis, the Warden of the MCCC, who was responsible for operations and management of the MCCC, the development, promulgation, and implementation of policies and procedures relating to the custody and care of prisoners housed at the MCCC and the supervision, hiring, firing, disciplining, training and oversight of corrections officers employed by the MCCC as well as the oversight and

---

Officer Defendants, and the Responding Correction Officer Defendants collectively as "the Individual Defendants." The Amended Complaint also names as Defendants John Does 1-10 (as yet unidentified persons or corrections officers involved or responsible for the monitoring, supervision, and care of prison inmates, including Plaintiff); and ABC Entities 1-15 (unidentified public entities, agencies, units, or subdivisions responsible for oversight, management, hiring, firing, monitoring, disciplining, training, and supervision of corrections officers and management and operations over corrections officers). (ECF No. 38 ¶¶ 21-23.)

[2]    On a motion to dismiss, the Court accepts as true all well-pled facts in the Amended Complaint. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)).

2

management of Plaintiff; Paris, the MCCC Deputy Administrator, who was responsible for operations and management of the MCCC, the development, promulgation, and implementation of policies and procedures relating to the custody and care of prisoners housed at the MCCC and the supervision, hiring, firing, disciplining, training and oversight of corrections officers employed by the MCCC as well as the oversight and management of Plaintiff; Kownacki, a supervisory officer at MCCC who (together with Ellis and Paris) was responsible for the overall operation and management of the jail, including hiring, firing, monitoring, disciplining, training, and supervision of shift supervisors, including but not limited to Creighton, and corrections officers, including but not limited to the individual named correctional officer defendants in the present matter, and the oversight and supervision of Plaintiff; Creighton, a shift commander at MCCC responsible (with Kownacki) for supervision of the "B Pod," including hiring, firing, monitoring, disciplining, training, supervision of the individually named corrections officers as well as oversight and supervision of Plaintiff; Herbert, Williams, Walker, Johnson, Santos, Riccitello, Durr, and Falconio, who were all corrections officers on duty at the time of the subject occurrence, responsible for B Pod I or II or B Pod Lower and for the oversight, management, supervision, safety, and care of Plaintiff; and Brassell, Brown, Davis, and Mesday, corrections officers on duty at the time of the subject occurrence and charged with responsibility for the oversight, management, supervision, safety and care of Plaintiff. (*Id.* ¶¶ 2, 5–21.) All of the Individual Defendants are named in both their official and individual capacities. (*Id.*)

### 1.    The New Year's Eve Assault on Plaintiff

Awaiting resolution of charges for possession of a firearm and receiving stolen property, Plaintiff had an excellent record at the MCCC and was not known to cause problems or concerns for the facility and its staff. (*Id.* ¶¶ 43, 52.)

3

On November 21, 2021, Plaintiff was the victim of an assault by inmates perpetuated in a general housing unit, which resulted in a fractured nose. (*Id.* ¶¶ 46-47.) Corrections staff ("including the immediately responsible monitoring officers posted to Plaintiff's housing unit as well as their supervisors and policymaker defendants") knew about this prior assault. (*Id.* ¶ 45.) The Field Supervisor Defendants and the B Pod Correction Officer Defendants knew or should have known that Plaintiff was being subjected to gang or "'street' violence relating to violence outside of the jail" affecting Plaintiff's safety and that he required continued medical treatment; had actual notice of the problem with other inmates due to the November 21, 2021 assault, which required admission to a hospital; and, as supervisors and monitoring officers, should have known of the identities of the perpetrators of the November 2021 attack. (*Id.* ¶¶ 48-49 ("As supervisors and monitoring officers, they would have known the identities of the perpetrators as well.").)

Despite this knowledge, instead of being transferred to the infirmary or another safer housing unit, Plaintiff was transferred to the B Pod lower/B Pod 1 housing unit. (*Id.* ¶ 44.) According to Plaintiff, he was sent back to the general housing unit with the same inmates who had attacked him and/or other inmates also prepared to assault him. (*Id.* ¶ 47.) "The placement of [Plaintiff] in B Pod I was done with willful and reckless indifference, as [the Moving Defendants] and others knew there was a substantial certainty of harm to [Plaintiff] yet failed to address and remediate it." (*Id.* ¶ 51.) Furthermore, the Field Supervisor Defendants and the B Pod Correction Officer Defendants "failed to remediate the problem and have [Plaintiff] more closely monitored and/or taken to a housing unit which housed inmates not part of the gang or street violence causing the attacks on [Plaintiff]." (*Id.* ¶ 50.)

According to Plaintiff, MCCC policy required that B Pod be staffed with at least "two (2) more corrections officers with stations supervising that tier/unit," "[t]he officers were supposed to

4

be stationed in a location that would permit them to come to the aid of any inmate needing assistance and to deal with any issues," and their "job was to monitor and observe the inmates and take immediate action in the event of any problem." (*Id.* ¶ 53.) At the time of the attack (around midnight), the inmates were supposed to be locked in or about to be locked in their cells under the direct supervision of the assigned officers, including the B Pod Correction Officer Defendants. (*Id.* ¶ 55.) "Assigned COs would be able to observe from their desks or watch station everything that would be going on in the tier and day room leading back to the cells. The assigned corrections officers would be able to see the inmates going into the cells and locking in or being locked in." (*Id.* ¶ 56.) The Field Supervisor Defendants were also responsible for ensuring that the B Pod Correction Officer Defendants were following policy and protocol in maintaining their posts, watching, observing, and supervising the inmates on the pod to avoid untoward activities such as inmate violence and ensure that the inmates were safe. (*Id.* ¶ 57.)

However, the usual and customary number of guards were not scheduled, or were on leave, or otherwise not available and not at their stations in the housing unit when inmates were permitted to come into Plaintiff's cell and attack Plaintiff. (*Id.* ¶ 33.) "[O]n information and belief," the MCCC was understaffed (or did not have "sufficient and/or sufficiently trained personnel available on December 31, 2021, New Year's Eve." (*Id.* ¶ 31.)

Around midnight, on December 31, 2021, Plaintiff went into his cell, followed by four to eight inmates, "who proceeded to beat him up." (*Id.* ¶ 58.) Upon information and belief, some of the attackers were known to Plaintiff by their nicknames: G-5, Alfredo, and Burger. (*Id.*) Four assailants were named Breon Phelps, Tyrell Williams, Joseph Fayson, and Justin Malkin. (*Id.*) Plaintiff was hit multiple times by a blunt object, and the inmates locked themselves in Plaintiff's cell and began to pummel, punch, and kick him. (*Id.* ¶ 61.) Plaintiff also recalled momentarily

blacking out and then trying to "ball up" under a bench during the assault. (*Id.*) The inmates beat him with blunt objects around his head and face. (*Id.* ¶ 62.) Plaintiff tried to crawl out of the cell, but the door was locked. (*Id.* ¶ 62; *see also id.* ¶¶ 60, 63 (alleging upon information and belief that Plaintiff's two bunkmates were also beaten and/or tried to assist Plaintiff in fending off the attack and that there is camera footage of the incident)).

Plaintiff alleges the attack lasted several minutes—upon information and belief, three to ten minutes—and he received no assistance from either the B Pod Correction Officer Defendants (who were assigned to the specific B Pod housing unit), the Responding Correction Officer Defendants (who responded to a code for assistance), or the Field Supervisor Defendants (the supervisors on duty at the housing unit). (*Id.* ¶ 30.)

According to Plaintiff, the attack began and continued without any intervention by either the B Pod Correction Officer Defendants or the Field Supervisor Defendants. (*Id.* ¶ 60.) "After a lengthy period of time, at least several minutes, the B Pod [Correction Officer] Defendant Herbert himself attempted to lock in the inmates without any assistance from the [other B Pod Correction Officer Defendants] who were missing from their assigned post or failed to assist." (*Id.* ¶ 64.) The Responding Correction Officer Defendants "finally came to assist after getting the emergency code but the response time was too late to stop, prevent or ameliorate the brutal assault." (*Id.* ¶ 65; *see also id.* ¶ 68 ("For the Responding Correction Officer Defendants the response was too little too late.").) In addition, the Pod B Correction Officer Defendants and the Responding Correction Officer Defendants allegedly had sufficient time to respond to the beating (which was "going on for several minutes") but failed to intervene. (*Id.* ¶ 69; *see also* ¶¶ 73-75 (similarly alleging that the Pod B Correction Officer Defendants were monitoring or should have been monitoring the tier and lockdown but waited several minutes before calling a code or attempting to intervene and were

also able to or should have been able to observe the fight yet did nothing about it in violation of policy until it was too late and that the Responding Correction Officer Defendants also had sufficient time and opportunity to intervene but failed to do so).)

Plaintiff alleges that the "[t]he policies, protocols, and standards requiring timely and immediate intervention to prevent and de-escalate assaults and violence, policies involving housing posts, assignments, security and emergency procedures were not followed, leading to the constitutional violations;" "[t]here were insufficient policies and procedures in effect or enforced regarding response to outbreaks of violence between inmates, to protect against such violence, and to quickly and effectively respond to emergencies involving assaults between inmates and to intervene to prevent them or stop them;" and staffing policies were "not adhered to, a direct and proximate cause of the constitutional violations alleged herein," and "[t][here should have been sufficient numbers of jail employees and corrections officers available to supervise and monitor inmates in the various jail dorms, including B Pod, so that a short or understaffed situation would not occur and/or would not preclude immediate and effective intervention in inmate-on-inmate violence and assault." (*Id.* ¶¶ 66, 70-72.)

As a result of the New Year's Eve attack, Plaintiff was taken to the infirmary and then the hospital. (*Id.* ¶ 67.) Plaintiff suffered severe injuries, including a fracture of left orbital floor, refractured nose (which had been fractured in the November 2021 assault), and other facial fractures. (*Id.* ¶¶ 28, 46.)

### 2. The Alleged History of Violence Against Inmates at the MCCC

According to Plaintiff, "[t]here was a known history of inmate-on-inmate violence which [Mercer County, the Policymaker Defendants, and the Field Supervisor Defendants] failed to remediate and/or in the alternative failed to see to it that staffing was sufficient and that staff were

7

performing their jobs and following policy despite that it was New Year's Eve, all of which was the proximate cause and moving force behind the deprivation of constitutional rights suffered by Plaintiff." (ECF No. 38 ¶ 32; *see also* ¶¶ 79 (alleging that Mercer County, the Policymaker Defendants, and the Field Supervisor Defendants knew there was a history of inmate-on-inmate violence at the MCCC and failed to remediate it), 81 (alleging that the same set of Defendants were on notice of, but failed to remediate, multiple problems with inmate-on-inmate violence, the lack of enforcement and/or promulgation of appropriate and necessary policies to remediate the chronic and severe problem with such violence, and the understaffing and shortages in manpower effecting the safe operation of the jail, including the prevention of inmate-on-inmate or inmate/officer violence).) Upon information and belief, no charges were issued against the supervising officers, and these officers were not disciplined ("indicative of a policy or practice of failing to remediate inmate violence"). (*Id.* ¶ 80.)

In the Amended Complaint, Plaintiff refers to several prior instances of inmate-on-inmate violence at the MCCC, including the November 2021 attack on Plaintiff himself:

> 1.    As reported in the media, on or about October 7, 2013, Lamar Gaines, an MCCC inmate, fatally choked and suffocated his cellmate, Darryl Boone. Three days before he murdered Boone, Gaines had assaulted another inmate (James Colman) in a similar manner, choking him unconscious and attempting to drown him in a slop sink, putting "these defendants" on notice of potential civil rights violations requiring them to investigate the allegations, commence an internal affairs investigation, and provide protection to inmates to correct misconduct, which did not occur. (*Id.* ¶ 82.)

> 2.    In October 2015, after MCCC officials approved housing Kevin J. Taylor, with an openly gay inmate, Taylor sexually assaulted his cellmate over two days. The assault and subsequent lawsuit put Mercer County, the Policymaker Defendants, and the Field Supervisor Defendants on notice of potential civil rights requiring them to investigate the allegations, commence an internal affairs investigation, and provide protection to inmates to correct misconduct, which did not occur. (*Id.* ¶ 83.)

8

3. In or around January 2021, Quinton Thompson, after complaining to MCCC staff that there were serious threats on his life by other inmates, was attacked on two separate occasions by other inmates, resulting in hospitalization and permanent injuries. Thompson filed suit against Mercer County, the Policymaker Defendants, and others, thereby putting them on notice of their failure to protect Thompson and others. (*Id.* ¶ 84 (citing Docket No. MER-L-000003-23).)

4. Between July 2021 and November 2021, Dane Sansevero, a pretrial detainee, was repeatedly assaulted by other inmates, thereby moving him from one attacker to another following his transfer requests. "Sansevero later filed suit, thus placing [Mercer County, the Policymaker Defendants, and the Field Supervisor Defendants] on notice of the MCCC's failure to protect detainees from inmate-on-inmate assaults (Case No. 22-1977 (MAS) (DEA))." (*Id.* ¶ 85.)

5. On September 19, 2021, at 10:15 p.m., a fight broke out between several inmates, resulting in one inmate being stabbed. The incident was widely reported in the media, putting Mercer County, the Policymaker Defendants, and the Field Supervisor Defendants on notice of the MCCC's failure to protect detainees from inmate-on-inmate violence. (*Id.* ¶ 86.)

6. In November 2021, Plaintiff was attacked by known gang members, and was not appropriately kept safe by moving him to a safe housing unit "and keeping the inmates separated." (*Id.* ¶ 87.)

Plaintiff also alleges that "[t]here are oversight and inspection reports for countywide jails in New Jersey, including accreditation and inspection reports issued by the Department of Homeland Security, the National Association of Correctional Healthcare, the American Correctional Association, the Office of County Services, State of New Jersey and others which provide analysis, evaluation and statistics of inmate-on-inmate violence and other matters." (*Id.* ¶ 102.) According to a quarterly review report by the New Jersey State Office of County Services, "between July and September 2022, in a population of only 24 inmates, there were 5 documented inmate-on-inmate assaults, or about 2 per month. In other words, during a three (3) month period, 21% of inmates were subject to attack, a very high percentage." (*Id.* ¶ 103.)

9

### 3.    Plaintiff's Counts

In his Amended Complaint, Plaintiff alleges five counts: (1) a count under 42 U.S.C. § 1983 (Monell & Supervisory & Individual Liability) (Count One) against all Moving Defendants; (2) a count under the New Jersey Civil Rights Act ("NJCRA") (New Jersey Constitution) (Count Two) against the Moving Defendants; (3) a "failure to intervene" count under both § 1983 and the NJCRA (Count Three) against the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants; (4) a count under the New Jersey Tort Claims Act ("NJTCA") for "Willful Misconduct" (Count Four) against the Moving Defendants; and (5) a count for infliction of emotional distress (Count Five) against the P Bod Correction Officer Defendants. (ECF No. 1 ¶¶ 91-184.)

Under Count One, Plaintiff alleges the following claims: "I. Constitutional Violations by the County Policymaker & Field Supervisor Defendants." A. "Monell, failure to train and supervise;" B "Deliberate Indifference to Housing Assignment;" and C "Failure to Follow Policy Regarding Staffing/Failure to Staff." (*Id.* ¶¶ 97-126.) Plaintiff also asserts claims for "II. Direct Participation by the Field Supervisor Defendants" and "III. Constitutional Violations by the [B Pod Correction Officer Defendants and the Responding Correction Officer Defendants]." (*Id.* ¶¶ 127-41.)

### B.    Procedural History

Plaintiff filed his initial Complaint on December 26, 2023. (ECF No. 1.) An Answer was filed, and the parties engaged in discovery (with the Moving Defendants disclosing documents, including officer incident reports). (ECF No. 54-1 at 15.) Plaintiff was granted leave to amend the Complaint on consent (given with the understanding that the Moving Defendants could pursue a motion to dismiss) (*id.*), and the Amended Complaint was filed on March 18, 2025 (ECF No.

38). Defendants moved to dismiss on July 25, 2025. (ECF No. 54.) On November 3, 2025, Plaintiff filed his opposition, and, on November 7, 2025, the Moving Defendants submitted a letter reply in further support of their Motion to Dismiss. (ECF Nos. 61-62.)

## II.   LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)).

A defendant moving to dismiss under Rule 12(b)(6) bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231-32 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

11

## III.   DISCUSSION

### A.   The "Group Pleading" Doctrine

Under Federal Rule of Civil Procedure 8(a)(2) a pleading must contain "a short and plain statement showing that the plaintiff is entitled to relief." The Moving Defendants argue that "Plaintiff improperly group pleads the named Defendants throughout the 'Factual Allegations and within every stated cause of action, leaving Defendants without notice of the claims they face,'" which is an impermissible manner of pleading. (ECF No. 54-1 at 20 (quoting *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 386 (D.N.J. 2019)).) Plaintiff purportedly groups the Moving Defendants together without specifying any facts showing as to how each individual Defendant is liable. (*Id.* at 20-24.) According to the Moving Defendants' reply letter, Plaintiff's Amended Complaint "involves improper, non-specific, group pleading—the proverbial kitchen sink" and "[e]ven though there are individual Defendants referenced by name, the alleged failures/wrongs by these Defendants are not individually or specifically articulated" and instead are "all lumped together for Defendants to guess." (ECF No. 62 at 2, 5.) Purportedly, "Defendants have no idea what they are facing under the current [Amended Complaint]. Without specific articulation as to each Defendants' failures and/or intentional action or inaction, these claims should not stand, and Defendants' Motion to Dismiss should be granted." (*Id.* at 6.)

A group pleading "is a complaint that 'fails to specify which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Foulke v. Twp. of Chery Hill*, Civ. No. 23-02543, 2024 WL 3568841, at *7 (D.N.J. July 29, 2024) (quoting *Morales v. New Jersey*, Civ. No. 21-11548, 2023 WL 5003891, at *4 (D.N.J. Aug. 3, 2023)). Group (or "shotgun") pleadings are those in which "it is 'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Innovative Cosm.*

12

*Concepts, LLC v. Brown Packaging, Inc.*, Civ. No. 18-5939, 2020 WL 7048577, at *2 (D.N.J. Apr. 28, 2020) (citing *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996))).

Courts in the Third Circuit often cite to the Eleventh Circuit when addressing group pleading issues. *See Foulke*, 2024 WL 3568841, at *7 (noting that the Eleventh Circuit has a robust doctrine regarding group pleading); *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 & n.3 (E.D. Pa. 2017) (same). As the Eleventh Circuit has explained, there are four broad categories of group pleading that merit dismissal: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts," (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," (3) a complaint that does not separate "into a different count each cause of action or claim for relief," or (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). The Moving Defendants' Motion to Dismiss implicates the fourth category of improper group pleadings.

Although not perfect, the Court concludes that the Amended Complaint adequately "specifi[e]s which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." In other words, the pleading sufficiently "makes clear which of the defendants it seeks to hold responsible for the [respective failures]," *Trussell v. Monmouth Cnty*, No. 25-0151, 2025 WL 914923, at *17 n.10 (D.N.J. Mar. 26, 2025) (quoting *Corbin v. Cnty. of Bucks*, 703 F. Supp. 3d 527, 533 (E.D. Pa. 2023)). The Court further notes that a certain level of overlap is not improper at the preliminary stage of the proceedings, especially

13

where, as here, multiple defendants allegedly held the same or similar positions and allegedly were responsible for the same or similar acts or omissions. *See also Mosley v. EzriCare LLC*, No. 23-20, 2024 WL 1342615, at *12-13 (E.D. Ky. Mar. 29, 2024) ("The overlapping allegations against the defendants do not transform the [a]mended [c]omplaint into a [group] pleading; the allegations are similar because the premise of the Amended Complaint is that EzriCare and its co-defendants engaged in similar conduct. At this point, before discovery and before more is known about each defendant's role in getting the relevant products to the market, the Amended Complaint is sufficient."); *Diamond Resorts U.S. Collection Dev., LLC v. Sumday Vacations, LLC*, No. 19-982, 2020 WL 3250130, at *2 (M.D. Fla. Feb. 21, 2020) (finding that a complaint alleging the defendants engaged in the same or similar conduct was not an improper group pleading that warranted dismissal). In fact, "Defendants point to no case in which the Third Circuit has ever recognized a categorical prohibition on . . . group pleading—*i.e.*, allegations that multiple defendants undertook the same action in tandem." *Corbin*, 703 F. Supp. 3d at 533; *see also Washington v. City of Jersey City*, No. 24-8597, 2025 WL 1742694, at *4 (June 23, 2025) ("'[A]llegations levied against multiple defendants satisfy Rule 8 when "there is no genuine uncertainty regarding who is responsible for what," such as when multiple defendants "are accused of acting jointly."' [*Corbin.*, 703 F. Supp. 3d at 533] (quoting *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013)).").

Initially, Plaintiff distinguishes between the respective Defendants by their respective positions and responsibilities at the MCCC, *i.e.*, (1) the higher-ranking Policymaker Defendants (Ellis and Paris, who held similar relatively high-ranking positions as the Warden and Deputy Administrator of the MCCC) were both responsible for operations and management of the MCCC; "the development, promulgation, and implementation of policies relating to the custody and care

14

of prisoners housed at the MCCC," and the supervision, hiring, firing, disciplining, training, and oversight of corrections officers employed by the MCCC, and oversight and management of Plaintiff. (ECF No. 1 ¶¶ 5-6); (2) the mid-level Field Supervisor Defendants (Kownacki, and Creighton), who, as MCCC supervisors on-duty on the night of December 31, 2021 (a captain/supervisory officer and a shift supervisor/commander), were also responsible (in their respective roles) for the operations and management of the jail; supervision, firing, disciplining, training, and oversight of subordinates; and oversight and management of Plaintiff, with Kownacki specifically responsible for hiring, firing, monitoring, disciplining, training, and supervision of shift supervisors, including Creighton, and Creighton for his part responsible (in conjunction with Kownacki) for "the supervision of the 'B Pod'" (*id.* ¶¶ 7-8); and (3) the rank-and-file "B Pod Correction Officer Defendants" and "Responding Correction Officer Defendants" on duty on New Year's Eve, 2021. (*id.* ¶¶ 9-20.)

The Court thereby agrees with Plaintiff that his allegations provide an adequate indication of what each and every defendant did, starting with outlining their roles and duties as "Parties" and then proceeding to describe the "Nature of the Action," the "Factual Allegations," including "The Incident & Housing Classification/Assignment," and "Notice of Inmate Violence," and five counts for relief under federal and state law. (ECF No. 1 ¶¶ 1-184.)

For instance, Defendants acknowledge that in Count One, Claim I.A., there are:

allegations that the policymaker/supervisor defendants failed to:

> Train, discipline and supervise corrections officers, including [the other named defendants] in how to handle and prevent inmate-on-inmate violence, how to prevent it, how to conduct themselves at their assigned posts, how to monitor and observe inmate activities and interactions, how to perform their duties and to follow policy, how and when to call for back up and time frames for response to inmate

> violence, among other policies necessary to deter inmate violence.

(ECF No. 62 at 5 (quoting ECF No. 61 at 19 (quoting ECF No. 1 ¶ 107)).) According to the Moving Defendants, "[this] is not "sufficient, specific pleading," and "[s]ome of the named defendants . . . were not even responsible for half of those duties." (*Id.* (citing ECF No. 1); *see also* ECF No. 54-1 at 20).

However, considering the pleading as a whole, Plaintiff adequately alleges for purposes of the "group pleading" rule that both Policymaker Defendants (Ellis and Paris)—as the head and deputy head of the MCCC responsible for overall operations and management, policymaking, and supervision, hiring, firing, disciplining, training, and oversight of lower-ranking supervisors and corrections officers at the facility—are liable for failing to train, discipline, and supervise their subordinates with respect to "how to handle and prevent inmate-on-inmate violence, how to prevent it, how to conduct themselves at their assigned posts, how to monitor and observe inmate activities and interactions, how to perform their duties and to follow policy, how and when to call for back up and time frames for response to inmate violence."

The Court reaches the same conclusion regarding Count One, Claims I.B., and I.C.. In short, in their roles as the Warden, the Deputy Administrator, supervisory officer/captain, and the B Pod shift commander: (1) under Count One, Claim I.B., the Policymaker Defendants and the Field Supervisor Defendants allegedly established a policy of deliberate indifference with respect to housing assignments (*e.g.*, they failed and refused in their respective roles to remediate the issue of problems between Plaintiff and other inmates despite knowing that Plaintiff had been beaten by other inmates and instead Plaintiff was moved to a housing unit that, upon information and belief, housed inmates also seeking to harm Plaintiff); and (2) under Count Two, Claim I.C., they allegedly failed to act regarding proper staffing (*e.g.*, failing to provide for a sufficient number of

16

corrections officers on New Year's Eve) (*Id.* ¶¶ 114-26.)  As to the supervisory liability claim against the Field Supervisor Defendants (Count One, Claim II.), Plaintiff sufficiently distinguishes between the admittedly similar responsibilities of the captain (Kownacki) and his subordinate (the shift commander (Creighton)) on duty on the night of the assault.  (*See Id.* ¶¶ 7-8.)

For substantially similar reasons, the Court finds that, with respect to the rank-and-file corrections officers on duty at the time of the New Year's Eve assault, the Plaintiff adequately "specifi[es] which of the defendants are responsible for which acts or omissions, [and] which of the defendants the claim is brought against," *Foulke*, 2024 WL 3568841, at *7 (citation omitted).

For example, the Moving Defendants assert that Plaintiff "group pleads" in Count One, Claim III., that the B Pod Correction Officer Defendants failed to keep Plaintiff safe by failing to be stationed, assigned, maintaining their assignments, and/or properly observing inmates and that, because of those failures, they are liable.  (ECF No. 54-1 at 21-22).  According to the Moving Defendants, "[O]f the eight (8) B Pod Defendants, none have notice as to any claim against them— i.e., who was not on the tier when they were supposed to be and/or who failed to watch the inmates." (*Id.* at 22.) Likewise, the Responding Correction Officer Defendants are allegedly liable because they failed to timely intervene or respond in accordance with policy.  (*Id.*) "Without more, [according to the Moving Defendants,] the Responding Officers are all improperly left with unanswered questions as to potential liability, such as: who was present when the code was called, who was assigned to which unit and/or where were they coming from to respond, who heard the code, who ignored the code and/or who did not move quick enough." (*Id.*; *see also* No. 62 at 5-6 ("As another example, it is not sufficient under Fed. R. Civ. P. 8 to lump all B Pod or Responding Officer Co-Defendants together and say on one hand they all failed to be stationed, assigned, maintain their assignments, and/or properly observe the inmates, but then on the other, that they

were observing and intentionally failed to intervene.").) The Moving Defendants likewise argue that Count Three improperly lumps together the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants by claiming that all B Pod Correction Officer Defendants had an opportunity to intervene, that all Responding Correction Officer Defendants failed to respond to the emergency code in a timely fashion, and that both groups of individual Defendants intentionally elected not to intervene. (ECF No. 54-1 at 23.)

However, Plaintiff explains that as to the question of which of the B-Pod Correction Officer Defendants were absent from the tier and/or failed to watch the inmates: "*All of them. Each and all. They* were *all* supposed to be there, according to the Complaint. The fact that individual defendants are liable for the same misconduct and named together in a paragraph does not constitute 'group pleadings' in the sense that there is insufficient notice to each defendant." (ECF No. 61 at 22.) Plaintiff's allegations regarding the B-Pod Correction Officer Defendants and the Responding Officer Defendants are sufficient for purposes of the group pleading rule. *See* Fed. R. Civ. P. 8(d)(2) ("[A] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").

While this case involves overlapping allegations, overlapping allegations do not transform a complaint into an improper group pleading, and, in fact, a plaintiff may permissibly allege that multiple defendants undertook the same action. *See also Mosley*, 2024 WL 1342615, at *12; *Corbin*, 703 F. Supp. 3d at 533. In the end, Plaintiff's pleading does not make it "'virtually impossible to know which allegations of fact are intended to support which claim(s) for relief,'" *Innovative Cosm. Concepts, LLC*, 2020 WL 7048577, at *2 (citation omitted)).

Accordingly, the Court concludes that the Amended Complaint does not constitute an impermissible "group pleading." However, merely because the allegations "may not be

18

categorically dismissed as 'group pleading,'" does not mean that Plaintiff's claims "are sufficient to state a claim for which relief may be granted," *Corbin*, 703 F.3d at 533. The Court next considers whether Plaintiff states a claim for which relief may be granted for purposes of Rule 12(b)(6).

### B.    Count One

Count One of the Amended Complaint sets forth the following claims under § 1983: Count One, Claim I.A. ("Constitutional Violations by the County Policymaker & Field Supervisor Defendants" for "Monell, failure to train and supervise"), Claim I.B. ("Constitutional Violations by the County Policymaker & Field Supervisor Defendants" for "Deliberate Indifference to Housing Assignment"), Claim I.C. ("Constitutional Violations by the County Policymaker & Field Supervisor Defendants" for "Failure to Follow Policy Regarding Staffing/Failure to Staff"); Count One, Claim II. ("Direct Participation by the Field Supervisor Defendants"); and Count One, Claim III. ("Constitutional Violations by the Corrections Officer Defendants"). (ECF No. 38 ¶¶ 97-141.)

#### 1.    *Monell* and Deliberate Indifference

In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court recognized that, while local government units can be liable under § 1983, "a municipality cannot be held liable under [the federal civil rights statute] on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Thus, a local government cannot be held liable for "an injury inflicted solely by its employees or agents." *Id.* at 694. However, a plaintiff may hold a municipality liable if he shows that the municipality's "choices were the 'moving force' behind the constitutional violation." *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (quoting *Monell*, 436 U.S. at 694).

There are two "avenues" for establishing municipal liability:

19

> A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, [*Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)] (citing [*Monell* 436 U.S. at 694]), or that they were caused by a failure or inadequacy by the municipality that "reflects a deliberate or conscious choice," *see id.* (internal quotation marks omitted) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)). The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers. *Id.* at 798–99.

*Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). While establishing an unconstitutional policy or custom is required under the first theory (and not required under the second theory), a failure/inadequacy theory of liability requires demonstrating that the failure/inadequacy amounts to deliberate indifference. *See Id.* at 106.

In *Monell*, the Supreme Court held that a municipality may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible." 436 U.S. at 694. "A policy need not be passed by a legislative body, or even be in writing, to constitute an official policy for the purposes of § 1983." *Porter v. City of Philadelphia*, 975 F.3d 374, 383 (3d Cir. 2020). A "pertinent decision by an official with final decision-making authority on the subject constitutes an official policy." *Id.* at 383 (footnote and citation omitted). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed by law, is so well-settled and permanent as virtually to constitute law." *Est. of Roman*, 914 F.3d at 798 (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). In any event, "if the conduct was simply that of an individual employee who was not acting pursuant to a policy or custom, that conduct cannot give rise to" a cognizable *Monell* claim. *Id.*

20

A plaintiff may bring a claim for the municipality's failure to train, supervise, or discipline subordinates. *See Young v. Monmouth Cnty.*, No. 24-4975, 2025 WL 354447, at *3 (D.N.J. Jan. 31, 2025). To plead a "failure to act affirmatively" claim, the plaintiff must allege facts showing "there was an obvious and clear need for the affirmative promulgation of a new policy to address deficiencies which, if left uncorrected, were so likely to cause a violation such as the one the plaintiff suffered that the defendant in question can be said to have been deliberately indifferent to the deficiency." *Id.* (citing *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222-23 (3d Cir. 2015); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)).

Accordingly, claims for failures in training, supervision, and discipline require a plaintiff to establish that a municipality's failure to train, supervise, or discipline "amounts to deliberate indifference to the rights of persons with whom the [subordinates] come into contact." *Kelley v. Reyes*, No. 19-17911, 2025 WL 618207, at *21 (D.N.J. Feb. 26, 2025) (quoting *City of Canton*, 489 U.S. at 388); *see also Young*, 2024 WL 354447, at *3. "This consists of establishing whether '[1] municipal policymakers know that employees will confront a particular situation, [2] the situation involves a difficult choice or a history of employees mishandling, and [3] the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Kelley*, 2025 WL 618207, at *21 (quoting *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)).

The plaintiff must allege facts showing that the failure to act reflects a deliberate or conscious choice. *See Beers v. Cnty. of Northumberland*, No. 23-2555, 2024 WL 2874283, at *3 (3d Cir. June 7, 2024) (per curiam); *Est. of Roman*, 914 F.3d at 798. "Additionally, 'the identified deficiency in a city's training program must be closely related to the ultimate injury;' or in other words, 'the deficiency in training [must have] actually caused' the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (alteration in original) (quoting

21

*City of Canton*, 489 U.S. at 391); *see also Beers*, 2024 WL 2874283, at *3 (same). "Establishing a failure to train claim under Section 1983 is difficult and applies in narrow situations." *Cooper v. City of Paterson*, No. 23-3566, 2024 WL 1298917, at *5 (D.N.J. Mar. 27, 2024) (citing *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997); *City of Canton*, 489 U.S. at 387)); *see also Young*, 2025 WL 354447, at *3 (stating that a municipality's culpability is at its most tenuous where a claim rests on a failure to train and will only be tenable where the failure to train amounts to deliberate indifference to the rights of persons in contact with untrained personnel).

In any event, a pattern of similar constitutional violations is ordinarily required to demonstrate deliberate indifference for purposes of failure/inadequacy claims. *See Hightower*, 130 F.4th at 357; *Thomas*, 749 F.3d at 223; *Young*, 2025 WL 354447, at *3. However, "[a] mere pattern of a handful of vaguely similar constitutional violations is generally insufficient to meet this requirement." *Young*, 2022 WL 354447, at *3 (quoting *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011)) (noting that, in *Connick*, the Supreme Court held that "having four convictions overturned for *Brady* violations over ten years was insufficient to support a failure to train claim where those violations were dissimilar to the specific *Brady* violation").

"Nevertheless, the Supreme Court posited in *Canton* that in certain situations, the need for training 'can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights' even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (quoting *City of Canton*, 489 U.S. at 390 n.10); *see also Hightower*, 130 F.4th at 130 ("The Supreme Court has 'hypothesized' that 'in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference.' *Connick*, 563 U.S. at 63). Single-incident claims depend on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that

22

situation will violate citizens' rights." *Thomas*, 749 F.3d at 223-24 (alteration in original) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty, Okla v. Brown.* 520 U.S. 397, 409 (1997)). "[S]uch a claim "is not viable in the absence of an extremely obvious deficiency." *Young*, 2025 WL 354447, at *3 (citing *Connick*, 563 U.S. at 63-64).

Here, Plaintiff's claims in Count One are ultimately based on the Moving Defendants' alleged failures to protect Plaintiff from harm. (*See* ECF No. 38 ¶ 92 (alleging that Plaintiff had a constitutional right under the Eighth and Fourteenth Amendments "to be protected from harm and to be safe as part of the conditions of confinement").) The Eighth Amendment imposes a general duty on prison officials to protect convicted inmates from violence by other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Similarly, pretrial inmates, such as Plaintiff, have a right under the Fourteenth Amendment to "security from physical assault by fellow prisoners." *Hightower*, 130 F.4th at 356 (citing *Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir. 1984)). "A prison violates that duty [to protect pretrial detainees and convicted prisoners] if it (1) creates conditions that 'pose[] a substantial risk of harm' and (2) is deliberately indifferent 'to inmate health or safety.'" *Id.* (alteration in original) (quoting *Farmer*, 511 U.S. at 834).

It is undisputed that, under either the Eighth or the Fourteenth Amendment, "[d]eliberate indifference" is a subjective standard whereby "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)), *abrogated on other grounds as recognized by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). As noted by the Third Circuit:

> [i]t is not sufficient that the official should have known of the risk. [*Beers-Capitol*, 256 F.3d at 133]. A plaintiff can, however, prove an official's actual knowledge of a substantial risk to his safety "in the usual ways, including inference from circumstantial evidence."

> *Farmer*, [511 U.S. at 842]. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

*Id.* at 367. To satisfy the deliberate indifference requirement, a plaintiff may allege facts plausibly indicating either that the official had notice of a particularized risk of a specific inmate being attacked by others or the existence of a longstanding and pervasive problem known to the official:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer*, 511 U.S. at 842-43 (citation and footnote omitted); *see also Keeling v. Wetzel*, No. 23-2045, 2024 WL 3770307, at *3 (3d Cir. Aug. 13, 2024) (per curiam) (considering whether allegations indicate that the inmate's cellmate "made specific threats of serious harm, describe a history of physical conflict with that cellmate, or otherwise suggest that a substantial risk of being attacked by his cellmate was 'longstanding, pervasive, well-documented or expressly noted by prison officials in the past'" (quoting *Farmer*, 511 U.S. at 842)); *Jeremiah v. Kovach*, No. 20-1915, 2022 WL 21778340, at *7 (M.D. Pa. Feb. 28, 2022) (stating that, under *Farmer*, an inmate could demonstrate deliberate indifference by showing either a failure to respond to a particularized threat to the victim or a substantial, long-standing, pervasive, or expressly noted risk of inmate attacks in circumstances suggesting that the official had been exposed to such information (quoting *McGlinchey v. Lane*, No. 18-14, 2020 WL 2513536, at *6 (W.D. Pa. May 15, 2020))).

### 2.    *Monell* **Policy or Custom Claims**

In Count One, Claims I.A., I.B., and I.C., Plaintiff alleges *Monell* claims against Mercer County. The Moving Defendants argue that "Plaintiff cannot make out an unconstitutional

policy/custom claim" because "Plaintiff has failed to assert any specific facts to demonstrate that the named Defendants constitute policymakers under State law." (ECF No. 62 at 6.) Furthermore, the Moving Defendants indicate that most of the purported "policy/custom" claims must be evaluated as based on the "failure to act" theory of *Monell* liability. (*Id.* at 30-37.) The Court agrees with the Moving Defendants that the policy claims must be dismissed. The Court also dismisses the failure/inadequacy custom claims and the staffing custom claims. However, because the Moving Defendants do not address it, the Court does not dismiss the claim that there was a municipal custom that permitted unimpeded and unremediated violence between inmates and the failure to intervene and to protect against it.

### a.    Policy Claims

As the parties note (ECF No. 54-1 at 31; ECF No. 61 at 31-32), in *Fisher v. County of Mercer*, No. 23-20947, 2024 WL 3594423 (D.N.J. Jul. 31, 2024), this Court considered whether an MCCC inmate sufficiently pled that Ellis is a municipal "policymaker" under *Monell*:

> Plaintiff alleges that Warden Ellis promulgated unconstitutional "policies" directed solely at him in retaliation for Plaintiff's filing of a prior federal lawsuit. The parties dispute whether this type of decision can ever state a claim under *Monell*. A *Monell* claim can involve a single decision or isolated incidents, *see [City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)] (An unconstitutional governmental policy may "be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."), and "[p]olicy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *G.S. v. Penn-Trafford School District*, 2023 WL 4486667, at *3 (3d Cir. 2023) (quoting [*Bielevicz*, 915 F.2d at 850]). At the pleading stage, "a plaintiff must show that an official who has the power to make policy is responsible for the action." *See id.* (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). In turn, when "deciding who has policymaking responsibility, 'a court must determine which official has final, unreviewable discretion to make a decision or take an action,' a question that is answered by looking to state law." *Andrews*, 895

F.3d at 1481; [*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)] ("[W]hether an official had final policymaking authority is a question of state law."). Moreover, "[t]he fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Porter*, 975 F.3d at 385 (citing *Pembaur*, 475 U.S. at 481-83). Instead, "[t]he official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.*

*Id.* at *5. The Court dismissed the *Monell* claims:

At issue then is whether Plaintiff sufficiently pleads a *Monell* claim based on Ellis' alleged promulgation of retaliatory policies against him. Here, Plaintiff alleges that Warden Ellis is "responsible for the operations of" MCCC and promulgated policies to deny Plaintiff medical care, remove a second mattress from his cell, and withhold Plaintiff's legal papers, legal documents, and other property. According to the Complaint, Ellis allegedly found out about a federal lawsuit Plaintiff filed in 2021 against C.F.G. and CCCF and created these policies to retaliate against Plaintiff for his protected activity. Although Plaintiff repeatedly characterizes Warden Ellis' alleged misconduct as "policies," he fails to allege sufficient facts showing that Ellis was a decisionmaker possessing final authority to establish these alleged policies on behalf of the County of Mercer. That is, Plaintiff does not provide sufficient facts showing that Ellis had any policymaking authority regarding an inmate's medical care or property. Nor does he provide any facts showing that New Jersey law provides the Warden with final policymaking authority in these areas. Instead, Plaintiff merely alleges that Ellis "was a high-enough-ranking public official so that policies that he promulgated could be said to be the policies promulgated by [the County of Mercer]." These allegations do not state a plausible claim under *Monell* because, accepting them as true, it is just as plausible that Ellis acted beyond the scope of his employment when he made these decisions, which would not give rise to municipal liability. The Court also credits Plaintiff's allegations that Gordon told him that he was being denied medical care and a second mattress due to a policy at MCCC, but those facts do not suggest that Ellis had any authority to create policies about Plaintiff's medical care on behalf of Mercer County. And without sufficient facts from which the Court can infer that Warden Ellis has final policymaking authority in the relevant areas, Plaintiff's claims against the County of Mercer rely on an impermissible theory of respondeat superior.

26

Plaintiff also contends that the issue of whether Warden Ellis is a final policymaker is a matter for discovery, but under *Pembaur*, 475 U.S. at 483, it is a legal question that is governed by state law. The Third Circuit has held that a plaintiff alleging a *Monell* claim must plead at least some facts regarding this "key element." *See Santiago v. Warminster Tp.*, 629 F.3d 121, 135 n.11 (3d. Cir. 2010) (explaining that the issue of whether a defendant is a final policymaker is ultimately a legal rather than a factual question but "that does not relieve her of the obligation to plead in some fashion that he had final policy making authority, as that is a key element of a *Monell* claim"). For these reasons, the Court grants the County Defendants' motion to dismiss and provides Plaintiff with leave to amend if he can cure the deficiencies in his *Monell* claims against the County of Mercer and Warden Ellis or otherwise clarify his claims for relief.

*Id.* at *6.

Plaintiff argues that the complaint in *Fisher* ("a denial of medical care and retaliation case") alleged that "very granular, specific acts by agency employees" were "policies" promulgated by Ellis (such as taking away a specific inmate's medically necessary mattress) and was pled as if the mere fact that an act was done by an employee automatically made that act a policy for the entire agency. (ECF No. 61 at 32.) According to Plaintiff, "Plaintiff Watson is not alleging that *each* act by a [B Pod Correction Officer Defendant or Responding Correction Officer Defendant] was, in and itself, a 'policy' of the entire agency," and instead he alleges that the Policymaker Defendants possessed "specific powers and responsibilities to do something about the staffing problems on holidays, knew about a pattern of misconduct permitting inmate violence to occur regularly and tolerated that 'custom,' and failed to take action." (*Id.*) Plaintiff notes that the Amended Complaint specifically states that Ellis (a "Policymaker Defendant") was responsible for operations and management of the MCCC; the development, promulgation, and implementation of policies and procedures; and supervision, hiring, firing, disciplining, training and oversight of corrections officers. (*Id.* at 3.)

27

However, Fisher alleged that it was Ellis who committed the "granular" acts, and this Court recognized that a *Monell* claim can involve a single decision if the decision is made by a municipal policymaker. *Fisher*, 2024 WL 3594423, at *6. Plaintiff thereby overlooks the gist of this Court's ruling—that Fisher failed to allege sufficient facts showing that Ellis "was a decisionmaker possessing final authority to establish [the] alleged policies on behalf of the County of Mercer." *Id.* In fact, like Plaintiff here, Fisher alleged that "Warden Ellis 'is responsible for the operations' of MCCC and promulgated policies," which this Court found was insufficient to state a plausible *Monell* claim. *Id.*; *see also Wagner ex rel. B.D. v. City of Newark*, No. 23-731, 2025 WL 635301, at *4 (D.N.J. Feb. 27, 2025) ("Regarding [Police Chief] Henry, Plaintiff's Amended Complaint states in a conclusory fashion that he was "responsible for the implementation of policies and procedures," but this fails to establish Henry had *final* policymaking authority." (citations omitted)). Neither Fisher nor Plaintiff has alleged facts indicating that, under New Jersey law, Ellis, even if he may exercise a substantial degree of discretion in his role as Warden of the MCCC, has "*final unreviewable* discretion to make a decision or take an action." *Id.* at *5 (emphasis added) (quoting *Andrews*, 895 F.3d at 1481; *Pembaur*, 475 U.S. at 483).

Plaintiff further indicates that "there is no reason to go behind [his policymaker] allegations because a defense attorney decides otherwise" (ECF No. 61 at 31), and notes that "Deputy Warden Paris is not addressed in *Fisher* case" (*id.* at 32). But, as *Fisher* makes clear, the issue of whether Ellis is a final policymaker is a legal question governed by state law, and a plaintiff must plead at least some facts regarding this element of a *Monell* claim. *Id.* at *6. Here, Plaintiff has failed to meet this burden. Furthermore, Plaintiff's "policymaking" allegations against Paris (who was Ellis's subordinate) are similar to his allegations against Ellis, and there is no indication that the

Field Supervisor Defendants have final policymaking authority on behalf of Mercer County under state law.

Accordingly, the Court dismisses without prejudice Plaintiff's *Monell* policy claims in Count One, Claims I.A., I.B., and I.C., against Mercer County.[3]

### b.    Custom Claims

Defendants likewise seek dismissal of the "custom" claims on the grounds that Plaintiff fails to show that the custom was created or acquiesced in by a municipal policymaker. (ECF No. 62 at 6.) *Fisher* did not address a custom claim. Furthermore, as the Third Circuit explained in *Bielevicz*: "This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence. Practices "'so permanent and well settled" as to have "the force of law" [are] ascribable to municipal decisionmakers.' *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir.1986) (quoting *Monell*, [436 U.S. at 691])." *Bielevicz*, 915 F.2d at 850 (final alteration in original); *see also Sabbagh v. Twp. of Mahwah*, No. 24-10209, 2025 WL 3749384, at *11 (D.N.J. Dec. 28, 2025) ("At the pleading stage, a plaintiff need not identify who the responsible decisionmaker is. [*Bielevicz*, 915 F.2d at 850]. Nor does he need to prove that the alleged custom had formal approval. *Estate of Roman*, 914 F.3d at 798.") Although the Moving Defendants rely on *Bielevicz*, they do not address (or acknowledge) the Third Circuit's discussion of decisionmakers and custom liability. Accordingly, the Court concludes that the Moving Defendants do not establish that the Court should dismiss the *Monell* custom claims based on their "policymaker" theory. *See Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.*, 974 F.3d at 231-32.

---

[3]    In his § 1983 and NJCRA claims, Plaintiff names the Individual Defendants in both their individual and official capacities. (ECF 38 ¶¶ 141, 152, 164.) However, "a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them." *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) (citing *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997)). The Court accordingly dismisses with prejudice Counts One, Two and Three to the extent they allege claims against the Individual Defendants in their official capacities.

On the other hand, as the Moving Defendants indicate (ECF No. 54-1 at 30-37), most of Plaintiff's custom claims against Mercer County really implicate the "failure/inadequacy" theory of liability. It is undisputed that there are two separate distinct avenues for establishing municipal liability. *See Forrest*, 930 F.3d at 105. While showing an unconstitutional policy or custom is required under the first theory (and not under the second theory), a failure/inadequacy theory of liability requires a showing that the failure/inadequacy amounts to deliberate indifference. *See id.* at 106. "As a result, the bare notion that a custom or policy of 'essentially unsupervised' officers led to Forrest's injury has no basis in law," and accordingly such failure/inadequacy claims must be considered under the second "deliberate indifference" approach. *Id.* at 107 (citation omitted).

Accordingly, the Court dismisses without prejudice Count One, Claims I.A., I.B., and I.C to the extent they allege a "custom" under the failure/inadequacy avenue or theory of municipal liability. (*See* ECF No. 38 ¶ 107 (alleging in Claim I.A. the existence of a "custom" of failing to train, discipline, and supervise corrections officers).) Plaintiff's failure/inadequacy claims are more appropriately analyzed as deliberate indifference claims, which this Court analyzes in Section III.B.3., *infra*

As to Count One, Claim I.C., the Moving Defendants acknowledge that a plaintiff may pursue a policy/custom *Monell* claim regarding staffing and failure to staff. (ECF No. 54-1 at 36). Instead, the Moving Defendants argue that Plaintiff fails to allege the elements of such a claim (*i.e.,* a policy/custom to understaff and a link between this failure to staff and the injuries). (*Id.* at 36-37 (citing *Beers*, 2024 WL 2874283). Plaintiff does not specifically respond to this argument, and the Court dismisses without prejudice Count One, Claim I.C. against Mercer County to the extent it alleges a claim under the policy/custom route for the reasons stated by the Moving Defendants. However, the Moving Defendants also indicate that Count One, Claim I.C., may be

premised on the failure/inadequacy avenue (and accordingly the Court considers this failure/inadequacy claim in Section III.B.3).

Finally, the Court observes that Plaintiff claims in Count One, Claim I.A. that Mercer County, Policymaker Defendants, and Field Supervisor Defendants "knew, should have known, and were on notice of an unofficial . . . custom which permitted the unimpeded and unremediated violence between inmates and the failure to intervene and to protect against it, and condoned, tolerated or acquiesced to such misconduct by their subordinates." (ECF No. 38 ¶ 98.) The Moving Defendants do not address this alleged custom in their Motion to Dismiss. Because the moving party has the burden of "showing that a complaint fails to state a claim," *Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.*, 974 F.3d at 231-32 (citation omitted), the Court denies the Motion to Dismiss as to this specific "custom" claim against Mercer County, *see Forrest*, 930 F.3d at 107 ("At the outset, we emphasize that, properly considered, there are two ways in which Forrest's § 1983 claim against Camden may have proceeded: first, that Camden's policy or custom of permitting excessive force, false arrest, or other constitutional violations led to Forrest's injuries; and/or second, that Camden's failure to supervise, discipline, or train its officers amounted to deliberate indifference to the rights of the individuals with whom those officers would come into contact.").

### 3.    *Monell* Failure/Inadequacy Claims

As the Moving Defendants indicate, Plaintiff also alleges *Monell* claims for failures or inadequacies in training, supervision, discipline, housing assignment, and staffing as against Mercer County. (ECF No. 54-1 at 30-37.) The Moving Defendants ask the Court to dismiss these failure/inadequacy claims because Plaintiff fails to establish that Mercer County violated his

31

constitutional rights through deliberate indifference.[4]  (ECF No. 54-1 at 32 (citation omitted).) Specifically, the Moving Defendants argue that "the six (6) incidents of inmate violence and the NJ Report" cited in the Amended Complaint do not show that they were on notice of chronic inmate violence but failed to act, "or here, failed to train." (*Id.* at 33 (citation omitted).)  The Moving Defendants note that the "the NJ Report" references incidents in accordance with the Isolated Confinement and Restriction Act ("ICRA") as opposed to incidents involving the entire jail population. (*Id.*)  According to the Moving Defendants, the ICRA report indicates that, during the reporting period (July-September 2022), the MCCC had twenty-four male inmates placed in housing statuses as defined in the ICRA and five of those inmates committed assaults against either other inmates or staff members. (*Id.* at 9 nn. 5-6, 33.)  Purportedly, the fact that Plaintiff was relocated following the first assault shows diligence (and not deliberate indifference). (*Id.* at 34.) The Moving Defendants also contend that "[t]his case is clearly unlike *Forest*," where there was sufficient evidence of significant mishandling of subordinate complaints by supervisors.  (*Id.* at 34-35.)

As to the other failure/inadequacy claims, the Moving Defendants likewise argue that the claim for failure to supervise must be dismissed because Plaintiff provides baseless accusations that they knew of a history of inmate violence, that officers failed in their duties, and knowingly failed to supervise.  (*Id.* at 35.)  Regarding the matter of housing assignments, the Moving Defendants claim that Plaintiff admits he was relocated to a completely different housing unit, that his allegation that the Moving Defendants had knowledge of the issues he had with other inmates is contradicted by his statement that he was a model inmate with no issues, and there are no details supporting any claim that Mercer County had any knowledge of "who Plaintiff was, let alone

---

[4]    The Moving Defendants do not argue that such "failure to" claims should be dismissed because Plaintiff failed to identify a specific municipal policymaker.

32

Plaintiff's November 2021 assault" or that any policymaker knew about the ongoing issues between Plaintiff and other inmates. (*Id.* at 36.) Finally, according to the Moving Defendants, there is no showing that "the policymaking Defendant was deliberately indifferent to his safety by deliberately choosing to understaff its jails." (*Id.* at 37.)

The Court finds that Plaintiff alleges sufficient factual content to raise a reasonable inference that the Mercer County was deliberately indifferent. *See Clark*, 55 F.4th at 178. An inmate may demonstrate deliberate indifference not only by showing that prison officials failed to respond to a "particularized threat" to the victimized inmate but also by "showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." *McGlinchey*, 2020 WL 2513536, at *2 (quoting *Farmer*, 511 U.S. at 842); *see also Young*, 2025 WL 354447, at *3 (indicating that a pattern of similar constitutional violations is ordinarily required to demonstrate deliberate indifference for purposes of a failure/inadequacy claim). At this preliminary stage, Plaintiff adequately pleads a longstanding and pervasive problem of inmate attacks at the MCCC based on multiple prior incidents and lawsuits involving inmate-on-inmate violence, including a prior incident involving Plaintiff himself, an inmate murder, and several incidents in 2021, and data from an official report presenting a "snapshot" of inmate-involved violence in a specific housing setting.

Specifically, Plaintiff alleges that, on or about October 7, 2013, Gaines was fatally choked by a cellmate named Boone, who, three days earlier, had assaulted another inmate (Colman) in a similar fashion (choking Colman unconscious and attempting to drown him in a sink). (ECF No. 38 ¶ 82.) In October 2015, Taylor, a known sexual predator, was assigned to the same cell as an

33

openly gay inmate, and Taylor then proceeded to sexually assaulted the cellmate for a two-day period. (*Id.* ¶ 83.)

In 2021, the year in which Plaintiff was assaulted in the subject incident, Plaintiff identifies multiple incidents of inmate-on-inmate violence. In or around January 2021, Thompson, after complaining to MCCC staff that other inmates had seriously threatened his life, was "brutally attacked on two separate occasions by inmates, resulting in hospitalization with permanent injuries." (*Id.* ¶ 84.) "Thompson brought suit against Mercer County, Ellis, Paris, and others thus putting them on notice of these Defendants' failure to protect Thompson and other inmates. (Docket No. MER-L-000003-23)." (*Id.* ¶ 84.) Similarly, Sansevero filed a lawsuit alleging that, between July and November 2021, he was repeatedly assaulted by inmates "as MCCC moved him from one attacker to another." (*Id.* ¶ 85 (citing Case No. 22-1977 (MAS) (DEA)). On September 19, 2021, a fight broke out between several inmates, resulting in a stabbing. (*Id.* ¶ 86.) Finally in November 2021, Plaintiff was assaulted. (*Id.* ¶ 87.)

The Moving Defendants contend that these incidents are insufficient because a "sum total of six (6) assaults [in ten years] is extremely low" (where, over that period of time, the MCCC purportedly "has housed tens of thousands of inmates"), and these instances are "documented as having resulted in no lawsuit, outright dismissal, and/or pending outcome." (ECF No. 54-1 at 34 (citation omitted).) However, Plaintiff cites to two rulings from this District denying motions to dismiss in which counsel had also relied on other lawsuits.[5] (ECF No. 61 at 28.) In addition,

---

[5]    In *Goodell*, "Plaintiff alleges these Defendants were aware of prior incidents of excessive force but failed to address their deficient policies; failed to adequately train the officers on excessive force; and failed to adequately discipline the officers for use of excessive force." *Goodell v. Lanigan*, No. 18-16588, 2020 WL 525927, at *5 (D.N.J. Jan. 31, 2020) (citations omitted). "[I]n light of those specific allegations, which are not addressed by Defendants, their Motion to Dismiss the supervisory liability claims is denied." *Id.* (footnote omitted), In the other case cited by Plaintiff (*Garreffi v. Hicks*, No. 20-16396), the court rejected the policymaker defendants' assertion that

34

Moving Defendants acknowledge instances that are "pending outcome," and they also acknowledge that the lawsuit filed by the inmate assaulted by Taylor was decided on a summary judgment motion, not a motion to dismiss.  (ECF No. 54-1 at 7 n.2)

Plaintiff further alleges the following: "[I]n a quarterly review of the MCCC, by the New Jersey State Office of Custody Services, between July and September 2022, in a population of only 24 inmates, there were 5 documented inmate-on-inmate assaults, or 2 per month.  In other words, during a three (3) month period, 21% of inmates were subject to attack, a very high percentage." (ECF No. 38 ¶ 103.)  According to the report (submitted as an exhibit by the Moving Defendants), during the applicable three-month period, MCCC had twenty-four male inmates in housing statuses as defined in the ICRA and there were five "Assaults" (defined as "[a]n incident in which an incarcerated person committed an assault while in a housing status defined in the ICRA, on staff *or on an incarcerated person*" in "Pre-hearing Disciplinary Housing" (housing in which an incarcerated person may be placed for a period not to exceed seventy-two hours where it appears necessary to remove or isolate the person from the general population until an investigation into alleged misconduct can be completed and a disciplinary hearing conducted and in which confinement is deemed necessary only if the person, if kept in his or her existing housing unit, would constitute a threat to other incarcerated persons, staff members, the incarcerated person, or to the safe, secure, and order operations of the facility).  (ECF No. 54-2 at 9-12.)  A report indicating that five assaults occurred in a special housing unit (which, while admittedly meant for

---

the second amended complaint failed to allege with requisite detail a policy or practice creating an unreasonable risk of a constitutional violation. (No. 20-16396, ECF No 62 at 3.) There, the court noted that "Plaintiff has outlined a documented history of more than a dozen recent allegations and reports of excessive force, sexual assault, and the failure to provide medical attention among DOC facilities, including NSP." (*Id.* (citation omitted) (noting, for example, that the plaintiff cites to excessive force incidents in 2016 and 2019 and failures to provide required medical attention in 2016, which did not result in any disciplinary actions).)

problematic inmates, thereby presumably should be more secure than other units like the B Pod) bolsters Plaintiff's claims of deliberate indifference.[6]

Given the prior alleged incidents (and the statistics), the Court concludes that Plaintiff alleges sufficient facts to state a facially plausible claim that Mercer County's policymakers acted (or failed to act) with deliberate indifference with respect to Plaintiff's failure/inadequacy claims.[7] *See Ferrara v. Monmouth Cnty.*, No. 24-4921, 2025 WL 2144085, at *10-14 (D.N.J. Jul. 29, 2025) (concluding in a case involving a fatal incident of inmate-on-inmate violence that, because the plaintiff cited to statistics showing an average of two assaults reported each week, one lawsuit alleging assaults by another inmate, five lawsuits involving alleged officer-on-inmate violence, and two drug smuggling conspiracies, the plaintiff alleged sufficient facts to state a facially plausible deliberate indifference claim); *Est. of Johnson v. Cnty of Sacramento*, No. 23-1304, 2024 WL 279137, at *5 (E.D. Cal. Jan. 25, 2024) (stating that plaintiffs adequately alleged inadequate supervision, monitoring, and observation of inmates by identifying several incidents where, although "the specific facts are distinguishable," "they say a lack of monitoring and observation of inmates has resulted in delays in care and, ultimately, death from overdose, withdrawal, and

---

[6] Because the full report supports Plaintiff's claims, the Court need not (and does not decide) whether it should not be considered on a motion to dismiss under Rule 12(b)(6). (ECF No. 61 at 13-15 (arguing that the extrinsic evidence introduced by the defense is not reviewable and, even if it could be considered, "the document does reflect inmate violence").

[7] The Moving Defendants also indicates that Plaintiff fails to show a specific deficiency in the training program and a link between the deficiency and the alleged injury. (ECF No. 54-1 at 32.) However, Plaintiff "cannot be expected to know, without discovery, exactly what training policies were in place or how they were adopted.'" *Huysers v. N.J. Dep't of Corr.*, No. 19-16786, 2021 WL 2680098, at *2 (D.N.J. June 30, 2021) (quoting *Carter*, 181 F.3d at 358). Accordingly, Plaintiff need not, at this preliminary stage of the case, identify the specific deficiencies in the training programs. *See Martinez v. City of Asbury Park*, No. 20-8710, 2021 WL 1343837, at *7 (D.N.J. Mar. 5, 2021) ("Plaintiff need not provide details about the Municipality Defendants' specific training programs or protocols at this stage of the case." (citing *Carter*, 181 F.3d at 358)); *Huysers*, 2020 WL 2764818, at *5.

36

assault by other inmates" (citation omitted)); *Shorter v. Samuels*, No. 16-1973, 2019 WL 6492534, at \*5 (M.D. Pa. Dec. 3, 2019) (concluding that the plaintiff adequately pled that the supervisory defendants had personal knowledge of and acquiesced in ongoing inmate-on-inmate violence derived from "reports, audits, complaints, and other sources").

In the end, the Moving Defendants' "various "deliberate indifference" arguments are better suited for a summary judgment motion as opposed to a motion to dismiss for failure to state a claim." *Ferrara*, 2025 WL 2144085, at \*14 (citing *Trussell*, 2025 WL 914923, at \*19; *Corbin v. Bucks Cnty.*, No. 23-2784, 2024 WL 2980218, at \*5-6 (D.N.J. June 13, 2024))). In fact, the Moving Defendants rely on a Third Circuit opinion that was decided on summary judgment grounds. *See Forrest*, 930 F.3d at 98. The Court concludes that Plaintiff's Amended Complaint plausibly alleges *Monell* failure/inadequacy claims against Mercer County in Count One, Claims I.A through I.C.. regarding training, supervision, discipline, staffing, and housing assignments. The Moving Defendants may renew their arguments if they file for summary judgment after discovery is concluded.

### 4.    Supervisory Liability Claims

The Court further construes Count One, Claims I.A through I.C, of the Amended Complaint as alleging supervisory liability claims against the Policymaker Defendants and the Field Supervisor Defendants. The Policymaker Defendants and the Field Supervisor Defendants are named in both their individual and official capacities and as Defendants in Claims I.A, I.B., and I.C. (*See* ECF No. 38 ¶¶ 5-8, 97-123, 141.) Furthermore, it is undisputed that Count One, Claim II, alleges a claim of supervisory liability against the Field Supervisor Defendants. (*See id.* ¶¶ 127-33; *see also* ECF No. 54-1 at 38.)

37

The Moving Defendants argue that, while the Amended Complaint "conclusively states" that the Field Supervisor Defendants were responsible for their subordinates' conduct and enforcing policies, they knew they were short staffed, and they knew about Plaintiff's November 2021 attack (and that his subsequent housing was improper); no facts are pled to demonstrate supervisory liability because Plaintiff does not allege that the Field Supervisor Defendants themselves or by their direction violated his constitutional rights, were policymakers, or deliberately indifferent to their subordinates' violations. (ECF No. 54-1 at 38.)

There are two potential theories of supervisory liability. *See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Under the first theory, officials may be sued "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, custom, or practice which directly caused [the] constitutional harm.'" *Id.* (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). The second theory of supervisory liability provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his or her subordinates' violations. *See Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). "Failure to" claims constitute a subcategory of supervisory policy or practice liability. *See Harris v. Smith*, No. 25-3372, 2025 WL 2237554, at *2 (D.N.J. Aug. 6, 2025).

For the reasons stated in Section III.B.3., Plaintiff plausibly alleges that the Policymaker Defendants and the Field Supervisor Defendants were deliberately indifferent. Furthermore, Plaintiff adequately alleges that the Policymaker Defendants and the Field Supervisor Defendants acted in a supervisory capacity. (*See* ECF No. 38 ¶¶ 5-8.)

38

The Court denies the Motion to Dismiss the individual capacity claims in Count One against the Policymaker Defendants and the Field Supervisor Defendants.

### 5. Plaintiff's Claim for Failure to Protect Against the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants

The Moving Defendants argue that, "like the entire [Amended Complaint] [Count One, Claim III.,] fails to allege specific action/inaction by any of the named correction officer Defendants;" Plaintiff's allegations do not satisfy either the objective or subjective element of a "failure to protect" claim (*i.e.,* the allegations in Count One, Claim III., do not demonstrate that he was incarcerated in a place posing a substantial risk of harm or that any individual Defendant engaged in action/inaction to rise to a level of deliberate indifference to his health/safety); and, after the first assault in November 2021, MCCC staff relocated Plaintiff to a different housing unit. (ECF No. 54-1 at 40.)

The Court agrees with Plaintiff that he plausibly alleges: (1) "conditions that 'pose[] a substantial risk of harm' and (2) [that were] deliberately indifferent 'to inmate health or safety.'" *Hightower*, 110 F.3d at 356 (alteration in original) (quoting *Farmer*, 511 U.S. at 834). Plaintiff succinctly but accurately summarizes the gist of his failure-to-protect claim as follows:

> [P]laintiff alleged that he was put into a housing unit after his first beating with the same inmates who beat him up [and/or other inmates also prepared to assault him] and that the housing relocation was constitutionally deficient; the complaint is filled with references to the actions/inactions of the individual [B Pod Correction Officer Defendants and Responding Correction Officer Defendants]; failure to lock-down the inmates, failure to be at their assigned posts; failure to be available to stop multiple inmates from entering plaintiff's cell and beat him up, and the failure to intervene, among other violations.

(ECF No. 61 at 35 (citing ECF No. 38 ¶ 137); *see also id.* ¶¶ 43-75.) In fact, in Section III.B.3., the Court has already concluded that Plaintiff adequately alleges deliberate indifference. Accordingly, the Court denies the Motion to Dismiss as to Count One, Claim III.

C.    **The NJCRA Count**

In Count Two, Plaintiff alleges a claim under the NJCRA. (ECF No. ¶¶ 142-52.) The NJCRA is New Jersey's analogue to a federal civil rights claim under § 1983, and a claim under the NJCRA is generally construed identically to an equivalent federal claim and is subject to the same defenses. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). Accordingly, the Court dismisses without prejudice Count Two against Mercer County to the extent it alleges *Monell* policy claims, custom claims under the failure/inadequacy theory of liability, and a custom claim for understaffing under *Beers*. The Court also dismisses Count Two with prejudice as to Plaintiff's official-capacity claims against the Individual Defendants. The Court denies the Motion to Dismiss Count Two in all other respects.

D.    **Plaintiff's "Failure to Intervene" Claim Against the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants**

In Count Three, Plaintiff alleges a "failure to intervene" claim under both § 1983 and the NJCRA against the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants. (ECF No. 38 ¶¶ 153-64.) It is undisputed that, to plead a failure-to-intervene claim, the plaintiff must allege facts showing that the officer had a realistic and reasonable opportunity and simply refused to do so. *See Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). According to the Moving Defendants, the alleged facts describe negligence rather than intentional actions (*i.e.*, the MCCC was short-staffed due to the holiday, and officers were not at their posts or failing to pay attention). (ECF No. 54-1 at 42.) Asserting that there are conclusory allegations regarding what the officers did see or should have seen with respect to the New Year's Eve assault, the Moving Defendants contend that there are no other supporting facts to support Plaintiff's claim that an officer observed the assault and decided not to act, and instead the only facts showing that

40

an officer observed the assault is where Plaintiff admits the officers did respond and came to his aid. (*Id.* at 42-43.)

However, Plaintiff specifically alleges that: the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants "had the opportunity to intervene before and during the subject beating as they should have been observing and monitoring the lock in or lockdown of inmates into their cells at the time several inmates went into Plaintiff's cell to beat him;" upon information and belief, "[b]etween three (3) and ten (10) minutes or more elapsed before any assistance was provided to [Plaintiff] by any corrections officer or field supervisor officer;" during this time period, the B Pod Correction Officer Defendants and the Responding Correction Officer Defendants failed to intervene, summon help, or take other precautionary measures; and the Responding Officer Defendants failed to respond to the emergency code in a timely fashion and in accordance with applicable policy. (ECF No. 38 ¶¶ 156, 158-59.) Under the circumstances, the Moving Defendants fail to meet their burden of "showing that a complaint fails to state a claim,"[8] *Plavix Mktg., Sales Pracs. & Prod. Liab. Litig.*, 974 F.3d at 231-32 (citation omitted)).

## E.    NJTCA

In Count Four, Plaintiff asserts a "willful misconduct" claim under the NJTCA against the Moving Defendants. (ECF No. 38 ¶¶ 165-74.) The Moving Defendants argue that it is well established that a government entity is not liable under the NJTCA for acts or omissions of a public employee constituting willful misconduct. (ECF No. 54-1 at 43.) Plaintiff "agrees that the public entities should be dismissed" (ECF No. 61 at 39), and accordingly the Court grants the Motion to Dismiss Count Four as to Mercer County with prejudice.

---

[8]    However, the Court does dismiss with prejudice Count Three to the extent it seeks to hold the B Pod Correction Defendants and the Responding Correction Officer Defendants liable in their individual capacities.

41

N.J. Stat. Ann. § 59:5-2(b)(4) provides that "[n]either a public entity nor a public employee is liable for . . . any injury by . . . a prisoner to any other prisoner." However, the statute does not provide immunity if the conduct at issue "constituted a crime, actual fraud, actual malice or willful misconduct." *Est. of Vargas v. Cnty. of Hudson*, No. 2:14-cv-01048, 2020 WL 3481774, at *10 (D.N.J. June 26, 2020) (citing N.J. Stat. Ann. § 59:3-14). "Willful misconduct 'is not immutably defined but takes its meaning from the context and purpose of its use,'" and "falls somewhere 'between simple negligence and the intentional infliction of harm.'" *Id.* at *10 (quoting *Fielder v. Stonack*, 141 N.J. 101, 124 (1995)). While willful misconduct "need not involve the actual intent to cause harm, there must be some knowledge that the act is wrongful." *Id.* (quoting *Fielder*, 141 N.J. at 124). A defendant is not entitled to immunity if there is a "showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Id.* (quoting *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 N.J. 396, 414 (1962)).

The Moving Defendants assert that the Amended Complaint does not plausibly allege that the Policymaker Defendants, the B Pod Correction Officer Defendants, and the Responding Correction Officer Defendants knowingly engaged in any action or inaction demonstrating reckless disregard for Plaintiff's safety. (ECF No. 54-1 at 45.) "Given the Court's determination that Plaintiff plausibly alleges that [the Policymaker Defendants, the B Pod Correction Officer Defendants, and the Responding Correction Officer Defendants] were deliberately indifferent for purposes of [his] § 1983 and NJCRA claims, the Court likewise concludes that Plaintiff adequately pleads "willful misconduct" for purposes of [the NJCRA]." *Ferrara*, 2025 WL 2144085, at *14. Accordingly, the Court denies the Motion to Dismiss Count Four against the Individual Defendants.

### F.      Intentional Infliction of Emotional Distress

In Count Five, Plaintiff alleges an intentional infliction of emotional distress claim against the B Pod Correction Officer Defendants. (ECF No. 38 ¶¶ 175-84.)  To plead such a claim, the plaintiff must show outrageous conduct, proximate cause, severe distress, and either intentional action or a reckless disregard of a high degree of probability that emotional distress will follow. *See Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 335, 366 (1988).  According to the Moving Defendants, Plaintiff does not allege a plausible claim of intentional infliction of emotional distress because the Amended Complaint fails to allege that any B Pod Correction Officer Defendant engaged in outrageous, intentional, or reckless conduct. (ECF No. 54-1 at 46.)  Instead, the Moving Defendants argue that Plaintiff baldly alleges that the B Pod Correction Officer Defendants failed in their duties, causing him outrageous and severe emotional distress that no person could be expected to endure. (*Id.* at 46-47.)  The Moving Defendants assert that conclusory assertions of outrageousness and severity and mere allegations of emotional, physical, and psychological injuries, humiliation, and embarrassment are insufficient. (*Id.* at 47 (further noting that a plaintiff must allege more than humiliation, headaches, and embarrassment).)

Given the alleged "deliberately indifferent" failures on the part of the B Pod Correction Officer Defendants to protect Plaintiff from harm and to intervene in his defense (after a previous assault a month earlier) (failures which allegedly resulted in him being trapped and attacked in his own cell for several minutes (resulting in physical injuries and hospitalization)) (*see* ECF No. 38 ¶¶ 28-30, 43-75, 177, 180) , the Moving Defendants do not meet their burden under Rule 12(b)(6).

### G.      Qualified Immunity and Punitive Damages

The Moving Defendants move to dismiss the federal and state constitutional claims based on qualified immunity.  "At the motion-to-dismiss stage, courts evaluate qualified immunity for a

constitutional claim by examining (i) whether the complaint contains plausible allegations of a constitutional violation and (ii) whether the asserted constitutional right is clearly established." *Karkalas v. Marks*, 845 F. App'x 114, 118 (3d Cir. 2021) (citing *Wood v. Moss*, 572 U.S. 744, 757 (2014)). The doctrine only applies to officers named in their individual capacities. *See Fisher*, 2024 WL 3594423, at *4. The Moving Defendants seek qualified immunity under the first prong (ECF No. 54-1 at 48); however, for the reasons stated above, as to the individual-capacity claims against the Individual Defendants, Plaintiff alleges plausible constitutional claims.

As the Moving Defendants note (and Plaintiff does not dispute) (ECF No. 54-1 at 48-49), a plaintiff cannot recover punitive damages from a local government entity under either § 1983 or the NJCRA. *See City of Newport v. Fact Concepts, Inc.*, 453 U.S. 247, 271 (1981). Accordingly, the Court dismisses with prejudice Plaintiff's claims against Mercer County for punitive damages in Counts One and Two.

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, the Moving Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**. The Court dismisses with prejudice the individual-capacity claims against the Individual Defendants in Counts One, Two, and Three, the claims for punitive damages against Mercer County in Counts One and Two, and the claim against Mercer County in Count Four. The Court dismisses without prejudice the claims against Mercer County in Count One, Claims I.A., I.B., and I.C., and Count Two, to the extent they allege policy claims, custom claims under the failure/inadequacy theory of liability, and a custom claim with respect to staffing. The Motion to Dismiss is denied in all other respects.

44

45

An appropriate Order follows.

February 27, 2026

**GEORGETTE CASTNER**
**United States District Judge**